Madam Clerk, please call the next case. 312-0761 William Wilewski v. Menard, Inc. Mr. Cassidy, you may proceed. Good morning, Justices, Counsel. May it please the Court. My name is Chauncey Cassidy. I represent the appellant to Menard, Inc. in this matter. This appeal arises out of a jury trial that occurred in February 2012. I've identified a number of issues on appeal that I want to raise today. I want to begin with my motion for a new trial. The first basis for my motion for a new trial is based on the jury's allocation of fault in this case. In my motion for a new trial, I ask for a new trial on all issues. I recognize that on the allocation of fault issue, the Court can remand the case just on the issue of allocation of fault. I want to make my motion for a new trial all-inclusive, but I don't want to forego the opportunity to remand the case just for the purpose of deciding the allocation of fault. On that issue, when we look at all the evidence, the jury's decision here clearly is contrary to the evidence. There's ample evidence in the record of the plaintiff's comparative fault in this case. This is a trucking case. Menard's operates a distribution center out in Plano, Illinois. They load the trailers there. They initially secure them, but they do not have truck drivers. They have agreements and arrangements with trucking companies and brokers to haul their loads to various stores throughout the Chicago area and the Illinois area. In this case, Menard's had an agreement with Ken Rosencrantz and Sons Trucking. Rosencrantz and Sons, they then brokered, essentially, the load to the plaintiff in this case. He started hauling loads out of the distribution center in 2002. So for two years before the day of the accident, he's picking up loads, flatbed trailers, van trailers, and taking them to various stores. Now, there's evidence in the record as to what the truck driver has to do or is supposed to do as a professional truck driver when they haul these loads, because ultimately the truck driver is the one responsible for making sure the load is safe on the road and secure at all times. So on the day of the accident, Plank goes to the distribution center, finds his trailer, does his inspection. We heard from Ken Rosencrantz. He talks about what he does when he does an inspection, how he looks at the trailer, what he does. Sometimes he gets up on the trailer, makes sure that not just the straps are secure, but also the cargo on the load is secure. The plaintiff did not do that in this case. He just looked at it from the ground. That aside, what he did see, he saw what was on the load. He saw the trusses. He saw the picks of lumber. He saw the other materials. He saw the bundle of rebar sitting up there on the picks of lumber. The rebar was positioned on the passenger side of the trailer next to the trusses. At all times, it's clear that he saw the rebar, where it was at and how it was configured on the trailer. So he does his inspection, finds it safe, roadworthy, ready to go, signs the bill of lading, accepts the load, and gets on the road. Once he signs that bill of lading, he's assuming responsibility for the load. He drives 87 miles to the Sterling store, has possession of the trailer for essentially two hours. During that two-hour time, he's in exclusive custody and control of the trailer at all times. He gets to the store, and there he checks in, and goes right away to where the offloading place in the parking lot is at. He then begins to unsecure, unstrap the load. Now, is that required? I was unclear from your briefs. Not all of us have a record at this time, but is that required, that the driver actually unstrap the load? That's industry custom practice. The driver does unstrap the load. Now, it's also possible, Ken Rosenkrantz testified to this. There's evidence in the record that if there's an issue, when he looks at the trailer, either at Plano or at the stored location, the final destination, if there's an issue, he can ask the Menard team members to help out. They have forklifts, they have different ways that they can help out. And that was not done in this case. And back at Plano, I have to point out, too, that as a professional truck driver, the plaintiff has the non-deltable duty to inspect the load, make sure it's roadworthy and safe. The fact that it was preloaded does not change his duties and responsibilities under the law. Yeah, but I mean, we're asking about scope of responsibility. Roadworthy, that means basically that when he takes possession of the trailer, I assume, and then travels down a highway, that the load doesn't fall off to the danger of the public. Is that the scope of responsibility he has? That's correct. But it's also, he has, once he assumes, once he accepts the load, he's responsible until he turns it over to the final destination or wherever it's going. And at all times here, he had full custody control of it. Now, the plaintiff's expert in this battle of experts, the plaintiff's expert said it would be your burden to make sure the rebar was properly secured. And all evidence says it was, because the plaintiff, when he inspected the load, he looked at it, he saw the rebar, and he saw where it was at, and it looked roadworthy to him. It looked like it was in a safe position. But now the defendant's own employees testified that the rebar would not have fallen unless it was in a precarious position, is that right? Precarious position, that was after he got to the store. Something must have happened when he got to the store after he unsecured the straps, and by definition, unsecured the load at the store. But didn't they say if it was loaded and in that kind of position? Well, there's conflicting testimony as to whether it was loaded. People did some armchair quarterbacking and said, well, maybe it could have went to a different location, and they changed the testimony and said, actually, it wouldn't fit between the trusses because then the load would be too wobbly. There was conflicting testimony about that. Of course, that's what the jury heard, right? Well, there was, but there's no question that the rebar itself was open and obvious to plaintiff at all times. Well, isn't this kind of a situation? You've got rebar on a stack of lumber, right? And you've got it strapped in position on those stack of lumber? Is that my picture you're giving me? It's a, they're lifts of lumber, stack of lumber. And the testimony is, the evidence is that that stack was level. It was flat and level. Right, but there were no chalks there on the outside to position the rebar against, say, the truss. I got a truss, and I got stacks of lumber, and I got rebar up here, correct? Right, and under the law, the responsibilities and duties for chalks, wedges, and whatnot, that falls on the truck driver and the carrier. And that's worn out in the federal regulations that were admitted to evidence. That the trial judge, as a matter of law, if one applied to the driver, William Mazdalouski and his carrier, it did not apply to Menards, the shipper. So any requirement, and the federal regulations also spell out that once the driver assumes responsibility for the load, he has to make sure that it's secure and safe at all times. So this, the jury had to consider this, this is all comparative negligence going on the plaintiff. Now whether it's 50%, 70%, but there's certainly a lot of evidence of comparative negligence. The jury disregarded all that and the federal regulations that clearly outline the truck driver's responsibilities and decided this case arbitrarily and unreasonably, Menards 100% liable and the plaintiff 0. So you're telling me that the federal regulations are, he's picked up a load that's strapped, okay? He's looking at it. Menards has no responsibility when they put the load on to chalk things that might roll over or roll around? That's correct. And there's no evidence that they did roll around here either. And they have no responsibility to chalk. That's the way the federal regulations are designed. They're designed to keep the road safe and they apply to the truck drivers. The trial court as a matter of law decided before this case, before the trial, that these regulations apply to the plaintiff as the carrier and the driver. Now your employees also testified that perhaps it was bad judgment to load the rebar on the outside of the trusses, right? There was one former employee of Midwest Manufacturing. When he looked at it, again, he was an armchair quarterback, and he said maybe it was not the best judgment to put it there. But he also testified later that he had seen rebar in that same position before, and there's no instances of any of the prior accidents. He also testified that initially he said maybe he could put it in between the trusses or a different portion of the trailer, but then later he said that he doesn't know if that would work or not. And for him to say, he said that without actually seeing the trailer, he can't say that it was unsafe in any way. And remember, the loaders are trained. These are not just new employees. But there's a difference between the truss department and the loading center, right? Correct. The trusses are Midwest Manufacturing, a division of Menard, and then the other materials, including the rebar, are out of the flatbed division. And there was testimony about maybe a lack of supervision in the truss department? Well, because the people that were there at the time, they were not there any longer, so they weren't sure what policies and procedures, but what is clear is that when that trailer moved between points, when it moved from the flatbed division to Midwest Manufacturing and then ultimately to the bullpen, it was moved by a yard driver who did his own inspection of the load and made sure it was safe and secure before it got to the bullpen. Now, all that does not change the fact that the plaintiff still has an obligation, a duty, to make sure that load is safe. He has to make sure that it's properly secured, but he also has to make sure the cargo is properly distributed on that load, and that's in the federal regulations that we're admitted to evidence. But is that only while he's present on a public way? No, that applies the entire time he has possession and custody of the trailer. Even on private property where he's offloading? He was not offloading anything. He did not offload the trailer. Well, I said he's on public property where offloading occurs. He is there. He's at Sterling Menards Yard, which is Menards' property, where it's to be offloaded. Correct. Okay. Correct. But he's not on public way at that point? At that point, no, he's not, but he still has not turned over custody control of the trailer to Menards. He still has it. Why would any truck driver assume any responsibility to unstrap a load that he never strapped in the first place? That's industry custom practice. Why would anybody engage in that practice, even though it may be industry custom? Is there any requirement that that be done? No, and if he feels when he does the inspection, Your Honor, if he does an inspection at the Plano facility, and Ken Rosenkranz testified to this, if he sees something that's wrong, he certainly has the right and the responsibility to redo it himself. I'm not talking about when he picks it up. He picks it up and he safely transported the load to Menards. All I'm asking is why would any truck driver want to take the responsibility of unstrapping anything other than, say, customer practice? Because if they get up on the trailer and they inspect it, they look at it, if there's a question about it, if they feel it's unsafe, then they can ask for help. And that's the way it's done. So that's one issue on appeal. Now, we also have, I also raised the issue of the trial court erring in improperly denying the motion for directed verdict and the judgment notwithstanding the verdict. In light of all the evidence, the evidence most favorable to the plaintiff leads to the conclusion that Menards owed plaintiff no duty at the time of the occurrence. It was not the proximate cause of the injuries. For all the reasons I elaborated before, the fact that he had full custody of the trailer, he had obligations as a truck driver, it was his responsibility to take care of the load and make sure it was safe when he got to Sterling when he was at Plano as well. Now, I also raised a number of issues regarding trial court error. First and foremost, allowing Professor Cooksey to testify as an expert witness. In this case, during discovery, he attempted to apply the federal regulations to Menards, the shipper. The trial court ultimately struck those opinions but did not fire him in his entirety. Any expert in the trucking industry familiar with the regulations would not try to apply these regulations when the entity is not covered. That would take an active legislature to do so. Professor Cooksey has no real trucking experience. The last time he worked in the industry was back in 1947. And his opinions as to securement and whatnot, they fly in the face of the federal regulations and are contrary to federal regulations. So his opinions in their entirety should have been stricken. Are there two special interrogatories in this case that the jury answered? Yes. They said the plaintiff wasn't at fault and so faultless the other side. Right, and that gets back to my first issue, Your Honor, on the assessment of comparative fault there. Based on the facts, plaintiff's actions, his omissions, the federal regulations, there's no way that the plaintiff can be found 0% at fault in this case. Now whether it's 0 or 50 or 40, there's certainly some comparative negligence there. I also raised issues about Professor Cooksey's testimony as to certain sections of the Bill of Lading. Those opinions were never properly disclosed. Professor Cooksey offered opinions as to the meaning of the one section of the Bill of Lading. Essentially he was interpreting a contract, a legal document. And obviously that type of opinion needs to be disclosed, and it was not. That opinion should have been disclosed. And another way he was trying to backdoor in Department of Transportation standards, interpretations that had previously been ruled by the trial court that he could not talk about these type of regulations is applying to Menard's. Counsel's time. So a lot of this was raised in the cross-examination and so forth. The jury gave it what weight it gave it, right, this testimony from Cooksey's. Correct, Your Honor. And again, I think that the fact that he was allowed to testify to these things, I think it confused the jury and it introduced things that were not properly, should not have been properly before the jury. Counsel, we've got time to reply. Thank you. Thank you. Mr. Oliveiro. Good morning, Your Honors. May it please the Court. My name is David Oliveiro, and I represent the appellee, Mr. William Wasilewski. Mr. Wasilewski, who was the plaintiff in the case below, is asking that this court affirm the decision of the trial court. Let me tell you a little bit about the case that's before you this morning. It arose out of, we believe, the negligence of Menard's, the shipper who negligently loaded, secured 2,000 pounds of steel onto the side of the trailer and failed to warn Mr. Wasilewski of the condition that it had placed this load of rebar in. The court's rulings on defendants' motions for directed verdict and judgment notwithstanding the verdict were properly denied. Menard's took complete responsibility of loading and securing the freight, including this rebar on its trailer. We know that from the facts in this particular case. There are two major departments that were involved in this case at the Menard's distribution center. The flatbed department, which would take an empty trailer and then load it up with building supplies. And when they did this, they included on this trailer the rebar. And they placed the rebar in the middle of the trailer on top of a load of lumber and strapped it down with straps. So it was perfectly fine. We have no contention that the flatbed department did anything wrong. In addition, the flatbed department would have a supervisor check the work of the loaders to make sure it met their standards. And the cardinal rule in the trucking industry as far as loading things is, if it's not safely loaded, it should go on to a different trailer. And in this particular case, we believe that the trust department, and the evidence poured out, placed the rebar from the middle of the trailer onto the side of the trailer. And when they placed it on the side of the trailer, there was not enough room for that 2,000 pounds of rebar to sit. It was actually a 12-inch diameter rebar, and it was sitting on an 8-inch lip of wood. They call it spacers that they use underneath different parts of the load. So it was actually sitting on an 8-inch spacer, and it's actually 12 inches wide. So you don't have to be a mathematical genius to figure out that some of the load was not being properly secured by a flat surface. That was a judgment by the trust department. They had no supervisor to check the work of the loader to see that this was in error. So it got passed on down the line to the different departments before it ended up in what's called the bullpen, which is where the truckers pick it up. So you're saying there's roughly 4 inches of that diameter that is not lying on anything. Correct. Because the spacer is for a forklift to go under and lift up. Correct. Absolutely. And the pictures bore that out. They were taken by the store in Sterling immediately after this happened, because the department that was in charge of unloading these things, they realized that there was something inherently wrong about the way that they loaded this. So they took pictures, and the young gentleman there at the store wrote on it, 12-inch wide bundle of rebar sitting on an 8-inch wide spacer. And he did that because he wanted to send it back to the transportation office and distribution center so they could see that this had occurred. That was a fact that's in the record. The truss department was trained differently than the flatbed department. The truss department was its own little entity. They actually made those pyramid-shaping wood trusses that we use for roofs. So they had their own identity. They had their own function. When they loaded trailers, they were more concerned about getting the trusses on the trailer than the stuff that they had to take off and ultimately had to put back on. So this particular loader just found a spot that was good enough, that was wide enough, he thought, to put this rebar back on. And that's where the bad judgment was. He should have placed it on a different trailer and not placed Mr. Wasilewski in danger of being hurt. Let me ask you, though, then was this condition hidden? In other words, we agree or you agree that you don't set a 12-inch circle of rebar on an 8-inch banner, but if somebody came up and looked at it, wouldn't they say, well, that's 12 inches of rebar sitting on 8 inches of wood. That's not right. Not necessarily. From ground level, it's 8 feet up. So you can't see it. Plus, they use straps to tighten the whole load together, to hold it all together. There's no sides to the trailer, so they use these 12-inch wide nylon straps to keep everything together. So it's kind of a one-unit thing. So by looking at it, there was nothing inherently obvious to anyone on the ground that there was this potential danger that awaited him when he unstrapped the load. And that's borne out by the fact that so many people at Menards passed this load on to the next department and found that there was nothing wrong, and they all wrote fine, roadworthy, no problem. And even on the bill of lading, the last document that was produced before Mr. Wasilewski took the load had a certification that the department found it to be, in other language, roadworthy, road ready. So everybody in Menards declared that this vehicle had been inspected, was safe, go ahead and take it. Now, obviously, Mr. Wasilewski still had a duty to do this pre-trip inspection under the federal regulations, which he did. Their expert had no criticism whatsoever of Mr. Wasilewski's inspection. And to your point, if the experts from Menards had thought that Mr. Wasilewski should have perceived this potential danger, he had no criticism whatsoever that Mr. Wasilewski didn't perform this pre-trip inspection correctly. My problem is the scope here a little bit. Okay, roadworthy is fine. I know what roadworthy is. It means I'm going down the road and that thing is going to fall off and hit the public or property. But now we're in an instance at private property, an unloading yard, a yard that's owned by Menards. We're no longer concerned with roadworthiness, are we? I mean, it's at this point that I can't imagine any attorney advising drivers, custom and practice aside, to unload, to unstrap anything that's been strapped by some third party. But this is custom and practice. It's undoing the straps that causes the four inches unsecured on an eight-inch spacer to go over, right? That was our position. So it would seem, what does the record say about seven foot up, eight foot up from ground level, is it possible to see that there's a space of four inches that's unsecured by spacers? There was no testimony. Either. Contrary to the fact that he could not have seen this danger. Our expert had no criticism of this inspection. Their expert had no criticism of the inspection. All the Menards people at the distribution center had no concern about the way that this rebar was placed. But I guess what I'm saying is I can place things that won't fall off trailers, but that makes it dangerous when the strap isn't there.  It was improperly loaded. From the ground level, it looked apparently like everything was within the confines of the trailer. So improper loading covers two situations, roadworthiness and safety of unloading. Absolutely. And that is what our expert testified. If a load is properly loaded, it should be able to travel down the road, and you should be able to take the straps off without the cargo coming down on top of you. That's what he testified to, and there was no evidence contrary to that. You know, there's a complaint by your opponent with regard to Cooksey's testimony with regard to the bill of lading and about whether or not that was an opinion that should have been disclosed, or it was not an opinion. In your position, it's not an opinion. Correct. That it was just a description of what the bill of lading said. Yes. Their position is it was an opinion that should have been disclosed. That was their position. Obviously, they prepared the document. They put on that document the certification that we feel is road-ready. He merely testified that by looking at the document, it appeared that it had been inspected by the transportation department. And the very next question that I asked Mr. Cooksey was, is it the industry standard that this transportation department would, in fact, inspect the trailer before they prepared the bill of lading? And he answered yes, and there was no objection to it. So I failed to see the logic in objecting to that question, and the court did as well. This was their prepared document. He was making an observation about what they had prepared. It wasn't a new opinion. And I cited a case, a products liability case, where there was some sort of defective welding helmet, and the expert for the plaintiff testified that there was a channel on the visor, and that helped the hot liquid roll off onto this gentleman's body. And the defense objected and said, well, you didn't mention anything about a channel in your opinions. And the court said, well, it was your helmet. It's obvious that there is a channel, so these are really not new opinions. It's something that's apparent and open to anyone who looks at it. So it really wasn't an opinion. It was more of an expression of what this document said, the plain language. And the trial court ruled on this? The trial court ruled on it. And as the court had pointed out, there were statements. I believe, Justice Carter, you mentioned there were statements by the manager of the trust department at the time that this occurred that it may not have been good judgment for them to put the rebar on the side of the trailer. He would have put it in the middle of the trailer, just like the flatbed department had done. He also mentioned that trusses and rebar don't mix well, meaning they're both big, bulky, heavy, and dangerous. And it's not always a good idea to put them on the same trailer. And as we pointed out through our evidence, there were plenty of other trailers that they could have placed this rebar on to have avoided this unfortunate accident. In addition, as Justice Carter mentioned, their own expert testified to the effect, and it's in the transcript, that cargo routinely falls if it's precariously. It has to be precariously laid there or positioned there for it to fall. It just doesn't magically fall off. That is the case. They placed the rebar on the side of the trailer, and it didn't just magically fall off. It was because they put it in a spot that was unsafe. And as far as the defense argument that since there was no comparative fault, a judge against Mr. Wasilewski would therefore be entitled or owed a new trial, throughout this particular case, it's obvious that Menards did a number of things that were wrong. And aside from their own safety expert, our expert testified to all the things that they should have done but didn't do. And the only criticism that the defense expert had against Mr. Wasilewski was where he stood when he unstrapped the load. It was his contention that he shouldn't have been standing next to the rebar when he unstrapped the load. But that's a ridiculous contention because that's the only place you can stand when you're unstrapping a load. There's no other position to be in. And even the store manager at Menards testified that you don't even know you're going to have a problem with the load until you begin to unstrap it because of the way it's configured. So he had no advanced warning or knowledge, and it wasn't obvious that this potential danger awaited him as soon as he unstrapped the load. Your opponent was not allowed to go into the child support league. Correct. And there had been testimony that was allowed in evidence with regard to activities and so forth. Would that have been appropriate at all in cross-examination about calling into question the activities? We hashed that out with the motion in limine, and the experienced trial court determined that the relevance of it was outweighed by any prejudicial effect in his granting our motion in limine. But he did advise both sides that all of his motions in limine could be revisited during the trial. And this issue about child support was never revisited during the trial. So my position is that they forfeited their right to bring that up at this point because they made no objection whatsoever to the testimony by the plaintiff's family members, nor did they re-offer this issue about unpaid child support. About the lien at the trial itself. Yes. I mean, this was all hashed out in the motions in limine that were brought beforehand. Yes, yes. Exactly. If there's no other questions, I'll conclude my argument. Thank you. I don't believe there are. Thank you, Mr. Oliveira. Mr. Cassidy, you may reply. Thank you, Your Honor. I want to go back to the configuration of this law for a moment. What we have, we have the rebar bundle sitting on top of the lumber picks. Now, the 8-inch spacer, that's extending out from underneath the trusses on top of the lumber picks. The rebar bundle is 12 inches. Underneath the bundle and the spacer is the picks. That area, the testimony and the evidence in the case is that area is more than 8 inches. So it's not like this rebar is just sitting there waiting to fall off. That's not the case. There's no evidence that it was like that. If it was, the plaintiff as a professional truck driver certainly should have seen it there before he set the load and put it on the road. So if I'm visualizing this, I've got spacers going from the truss, and I've got 8 inches exposed that I'm setting a 12-inch roll of rebar on. But extending beyond that spacer is some lumber picks. Correct. Underneath it. No, the spacer is also sitting on top of the lumber picks. That's correct. There still is about 4 inches of space between the bottom of the rebar and the lumber that's extending out. No? No, that's not correct. And the rebar bundle, too, is round. The circumference, the testimony was that the circumference sitting on the bottom and the spacer on the lift underneath that is only 4 to 6 inches. So it's not like there's a whole 12 inches sitting there on top of or on empty space. That was not the case. The store people said that it was flat, and everything was flat before and after. So the dimensions and the size of the space and area is not completely accurate, as the plaintiff alleged in the brief. Now, there's also the issue of... I have a question. Okay. If I'm standing at ground level and I'm looking up at the trailer and I'm there at the straps, how high in the air from the flatbed bottom of the flatbed is the rebar? There was no evidence in the record. No evidence of that. No. No. But to be clear, the plaintiff said when he was at Plano and at the store when he got there, he could see the bundle of rebar. He saw where it was positioned on the trailer. If it was precariously placed when he got to the store, he would be able to see that. There's no question about that. It was open and obvious at all times. Now, counsel references my expert's testimony as to precariously placed. What he's talking about is when he got to the store, he's at Sterling. The plaintiff unloaded on straps the first five straps. He actually... And then he goes and unstraps the sixth strap. That's when the rebar bundle fell. So my expert was saying that if it fell or if it was precariously placed, it was when it was at Sterling. There's no evidence it was precariously placed at the Plano DC. So something happened in transit. And the plaintiff acknowledged that, as all truck drivers do, loads shift in transit. Things move. That happens on the open road. There was also evidence that, you know, under the federal regs, he's supposed to stop within the first 50 miles to check on the load, securement, and on the cargo. He did not do that in this case. Again, this is more evidence of comparative negatives. There is certainly evidence here of his own fault in this case. And for the jury to decide that it's 100% Menard's fault is against the manifest way of the evidence. So based on that, Menard is asking that this court send us back for a new trial, either a new trial on all issues because of the other issues I raised and errors made by the trial court, or just on the issue of allocation of fault. Alternatively, we requested that this court reverse the judgment of the trial court and remand this matter back to the trial court with directions to enter JLV. Any further questions? I don't believe there are. Thank you. Thank you, Mr. Cassidy and Mr. Oliveiro, for your arguments in this matter this morning. It will be taken under advisement. A written disposition shall issue. The court will stand at brief recess for panel change. The court is now at recess.